Opinion issued January 8, 2009














     



In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00923-CR




JUAN CARLOS MOLINA, Appellant

v.

THE STATE OF TEXAS, Appellee




On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 1082890




MEMORANDUM OPINION

          Appellant, Juan Carlos Molina, was charged with capital murder for having
committed murder in the course of committing a kidnapping and robbery. See Tex.
Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2008). Appellant pleaded not guilty. 
The State did not seek the death penalty. A jury convicted appellant and assessed
punishment at confinement for life. 
          In his sole issue, appellant contends that the evidence is factually insufficient
to support his conviction because no evidence was presented that he intended to cause
the complainant’s death.
          We affirm.
Background
          On the evening of August 27, 2006, the complainant, Jeanette Gonzales, and
her best friend, Kristine Mangalindan, attended church. At approximately 6:45 p.m.,
the services ended, and the young women agreed to meet for dinner at the Hong Kong
Market (the “Market”) on Westheimer Road in Houston. The girls drove separately,
but left at the same time. Kristine entered the Market parking lot at around 7:00 p.m.,
and she saw Jeanette enter the lot and begin searching for a parking space. The lot
was very crowded, and Kristine soon lost sight of Jeanette. 
          Appellant and his wife or girlfriend, Claudia Fuentes, were also in the Market
parking lot, sitting in appellant’s parked car with their two small children. Claudia
testified that she and appellant were having a discussion when appellant received a
phone call from his girlfriend, Stacey Frazier. Claudia became angry, and an
argument ensued. Claudia testified that appellant told her that he was tired of his life
and needed money, and that appellant said, “I feel like robbing somebody. I feel like
hurting somebody.” 
          As Jeanette pulled her gray Mitsubishi Eclipse into the parking space next to
appellant’s car, appellant said to Claudia, “I got her.” Appellant got out of his car and
walked toward Jeanette. As appellant approached Jeanette, Claudia scooted into the
driver’s seat of appellant’s car and drove away.
          At approximately 7:30 p.m., Matthew Swann was driving on Westheimer Road.
As he crossed through the intersection at Kirkwood, he noticed a gray Eclipse ahead
of him, traveling at a rate of 30 to 35 miles-per-hour, with its passenger-side door
open. Swann saw a girl, later identified as Jeanette, holding onto the handle of the
door. She seemed to be reaching back into the car. Swann testified that Jeanette slid
out backwards, hit her backside on the road, spun around, and went under the car
momentarily. Swann saw that her head hit the car and the pavement. Jeanette’s body
came to rest on the side of the road near the driveway of an HEB grocery store. The
driver of the Eclipse drove away without stopping.
          Santina Rutherford was also on Westheimer Road, passing through the same
intersection, when she saw the Eclipse cut into the intersection from
Kirkwood—making a hard right turn. Rutherford saw something come tumbling out
of the Eclipse that appeared to be a person. Rutherford testified that she saw the car
“roll over the upper part of the body,” then pause momentarily, as a hand reached out
and closed the door. The Eclipse then sped away. 
          Both Swann and Rutherford stopped to aid Jeanette, but she was unresponsive. 
Swann called the police. Jeanette was identified at the hospital from a credit card that
was found clutched in her hand. Jeanette later died from her injuries.
          Claudia testified that, at 8:00 the same evening, appellant called and told her
to pick him up at an HEB grocery store on Beechnut Street. Claudia testified that,
when she arrived, appellant was carrying a purse and that he showed her where he
had parked Jeanette’s car, which was next to a dumpster at a gas station within sight
of the HEB. Claudia testified that appellant told her that Jeanette had jumped out of
the sunroof while he was driving. Claudia and appellant drove to appellant’s
mother’s house, and then appellant left to try to “get some money out of” Jeanette’s
credit cards.
          Appellant’s girlfriend, Stacey, testified that, at 9:00 or 10:00 that evening, 
appellant picked her up and that he told her that he and Claudia “were out carjacking
and . . . got [a] purse from an empty Honda[.]” Stacey and appellant made several
attempts to use Jeanette’s credit cards, including at a Wal-Mart.
          The next day, Stacey saw the Wal-Mart security video on television in a media
report and contacted the police through her attorney. Stacey’s information led the
police to appellant.
          Subsequently, appellant gave a videotaped statement to the police. In his
statement, appellant said that he needed money and that, when he approached
Jeanette, she had become frightened and had jumped over into the passenger seat of
her car. Appellant stated that, while he was driving, he opened the sunroof to let in
some air and that Jeanette jumped out of the sunroof. Appellant said that he panicked
and abandoned the car. Appellant admitted that he and Stacey had attempted to use
Jeanette’s credit cards. Appellant was arrested.
          While appellant was awaiting trial, he shared a holdover cell with Anthony
Shelnut, who later testified at appellant’s trial. Shelnut testified that appellant had
initially told him that Jeanette had jumped from the sunroof while he was driving. 
Later, however, when Shelnut had expressed disbelief to appellant, appellant said
that, although it was the story he had given to the police, something different had
actually happened. Appellant said he approached Jeanette with a pistol, forced her
into the back of the car, drove her around, forced her to have sex with him, and that,
when Jeanette tried to escape from the car, he sped up and pushed her out.
 
          Dr. Ana Lopez, assistant medical examiner for Harris County, testified that the
cause of Jeanette’s death was blunt force head trauma. Dr. Lopez explained in detail
that the injuries, which were concentrated on the left side of Jeanette’s body, were
more consistent with someone having come out of the side door of a moving vehicle,
rather than having jumped from a sunroof.
Sufficiency of Evidence 
          Appellant contends that the evidence is factually insufficient to sustain his
conviction because there is no evidence that he intended to cause Jeanette’s death. 
A.      The Standard of Review
          We begin the factual sufficiency review with the presumption that the evidence
supporting the jury’s verdict is legally sufficient. Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996). When conducting a factual sufficiency review, we view
all of the evidence in a neutral light. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim.
App. 1999). We will set the verdict aside only if (1) the evidence is so weak that the
verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great
weight and preponderance of the evidence. Marshall v. State, 210 S.W.3d 618, 625
(Tex. Crim. App. 2006). 
          Under the first prong, we cannot conclude that “a conviction is ‘clearly wrong’
or ‘manifestly unjust’ simply because, on the quantum of evidence admitted, [we]
would have voted to acquit had [we] been on the jury.” See Watson v. State, 204
S.W.3d 404, 417 (Tex. Crim. App. 2006). We must accord “due deference” to the
factfinder, who is in the best position to evaluate the credibility and demeanor of
witnesses. Marshall, 210 S.W.3d at 625. The factfinder may choose to believe all,
some, or none of the testimony presented. Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997). Before finding that evidence is factually insufficient to support a
verdict under the second prong, we must be able to say, with some objective basis in
the record, that the great weight and preponderance of the evidence contradicts the
jury’s verdict. Watson, 204 S.W.3d at 417. 
          In conducting a factual sufficiency review, we must also discuss the evidence
that according to the appellant, most undermines the jury’s verdict. See Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003). 
B.      Law Governing Offense 
          A person commits capital murder if he commits murder, as defined under Texas
Penal Code section 19.02(b)(1), and, inter alia, the person intentionally commits the
murder in the course of committing or attempting to commit kidnapping or robbery. 
Tex. Penal Code Ann. § 19.03(a)(2). A person commits murder if he “intentionally
or knowingly causes the death of an individual.” Tex. Penal Code Ann.
§ 19.02(b)(1) (Vernon 2003). 
          A person commits robbery if, in the course of committing theft, as defined in
Chapter 31, and with intent to obtain or maintain control or property, he intentionally,
knowingly, or recklessly causes bodily injury to another, or intentionally or
knowingly places another in fear of imminent bodily injury or death. Tex. Penal
Code Ann. § 29.02(a) (Vernon 2003). Theft is the unlawful appropriation of
property with the intent to deprive the owner of the property. Tex. Penal Code Ann.
§ 31.03 (Vernon Supp. 2008). 
          A person commits kidnapping if he intentionally or knowingly abducts another
person. Tex. Penal Code Ann. § 20.03(a) (Vernon 2003). “Abduct” means to
restrain a person with intent to prevent her liberation by: (A) secreting or holding her
in a place where she is not likely to be found or (B) using or threatening to use deadly
force. Id. § 20.01 (Vernon Supp. 2008).
          A person acts intentionally with respect to a result of his conduct when it is his
conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a)
(Vernon 2003). A jury may infer intent from any facts that tend to prove its
existence, including the acts, words, and conduct of the accused, the method of
committing the crime, and the nature of the wounds inflicted on the victim. Hart v.
State, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); Ford v. State, 152 S.W.3d 752, 756
(Tex. App.—Houston [1st Dist.] 2004, pet. ref’d).
 
C.      Analysis
          Here, the State presented evidence that appellant intentionally caused Jeanette’s
death. 
          Claudia testified that, at approximately 7:00 p.m. on the day of the incident,
while she and appellant sat in the Market parking lot, appellant became angry and
said, “I feel like robbing somebody. I feel like hurting somebody.” When Jeanette
parked her gray Eclipse next to appellant’s car, appellant said to Claudia, “I got her.” 
Claudia saw appellant get out of his car and approach Jeanette. From this evidence,
the jury could have inferred that appellant set out with the intent to harm Jeanette. 
See Hart, 89 S.W.3d at 64; Ford, 152 S.W.3d at 756.
          Swann testified that, at approximately 7:30 p.m., he saw the Eclipse ahead of
him on Westheimer Road, traveling at 30 to 35 miles-per-hour, with its passenger-side door open. Swann testified that he saw Jeanette holding onto the handle of the
door, that she seemed to be reaching back into the car, and that she ultimately came
out of the car backwards. From this evidence, the jury could have reasonably inferred
that Jeanette was struggling to resist expulsion from the car by appellant. See Hart,
89 S.W.3d at 64; Ford, 152 S.W.3d at 756. Swann further testified that, after Jeanette
fell from the moving car, appellant drove away without stopping. 
 
          Swann’s testimony was bolstered by that of another driver on Westheimer Road
at the time of the incident, Rutherford, who testified that she saw Jeanette tumble out
of the Eclipse, saw the car “roll over the upper part of the body,” then saw appellant
reach out, close the door, and speed away. A finding of intent may be inferred from
evidence of flight from the scene. See Wilkerson v. State, 881 S.W.2d 321, 324 (Tex.
Crim. App. 1994); see also Hunter v. State, 468 S.W.2d 96, 98–100 (Tex. Crim. App.
1971) (concluding that jury could reasonably infer intent to kill from evidence that
defendant drove vehicle at 30 to 40 miles per hour while woman clung to door, trying
to regain foothold, flew over car, and sustained skull fracture); Samuels v. State, 785
S.W.2d 882, 885 (Tex. App.—San Antonio 1990, pet. ref’d.) (concluding that
inference of guilt may be drawn from failure to stop and speeding away after person
thrown from moving vehicle to concrete pavement).
          Although the record shows that, in his statement to the police, appellant said
that Jeanette had jumped out of the sunroof of her own accord. The State also
presented evidence that appellant admitted to a fellow inmate that he had sped up and
pushed Jeanette out of the car. Shelnut testified that appellant had also initially told
him that Jeanette had jumped from the sunroof. Later, however, appellant admitted
to Shelnut that he had lied to the police, that Jeanette had tried to escape from the car,
and that he sped up and pushed her out. Appellant complains that Shelnut’s
testimony is not credible because he stood to gain from his testimony by having his
sentence in prior offenses reduced. Appellant argues that, “at most, Shelnut’s
testimony demonstrated that he wanted [Jeanette] out of the car, not that he wanted
her dead.” It is the province of the jury to resolve conflicts in the testimony and to
determine what weight to afford the evidence. See Marshall, 210 S.W.3d at 625.
          Finally, Dr. Lopez testified in great detail concerning the injuries that Jeanette
sustained and opined that the injuries were more consistent with someone having
come out of the side door of a moving vehicle, rather than from having jumped from
a sunroof. For instance, Dr. Lopez testified that Jeanette’s injuries were concentrated
on the left side of her body and did not include any long bone fractures of the legs,
which one would expect if Jeanette had jumped from the roof of a moving car. 
Jeanette did not have any significant injuries to her feet or abrasions on the palms of
her hand. 
          In contending that the evidence is factually insufficient, appellant complains
that there was not a witness who actually saw appellant push Jeanette from the
moving vehicle. The State was not required to produce a direct eyewitness. “Proof
of a mental state, such as an intent to kill, must almost always be proved by
circumstantial evidence.” Smith v. State, 56 S.W.3d 739, 745 (Tex. App.—Houston
[14th Dist.] 2001, pet. ref’d). A jury may infer intent from an defendant’s acts,
words, and conduct; from the nature of the crime; and from the wounds inflicted. 
Hart, 89 S.W.3d at 64; Ford, 152 S.W.3d at 756.
          As the determiner of the credibility of the witnesses, the factfinder may choose
to believe all, some, or none of the testimony presented. Cain, 958 S.W.2d at 407. 
Here, the jury chose to believe the testimony of Swann, Rutherford, Shelnut, and Dr.
Lopez. 
          Reviewing all of the evidence in a neutral light, we conclude that a reasonable
jury could have concluded that appellant acted with the requisite intent to cause
Jeanette’s death. See Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003),
§ 19.03(a)(2) (Vernon Supp. 2008). We cannot conclude that the evidence is so weak
that the verdict is clearly wrong and manifestly unjust or that the verdict is against the
great weight and preponderance of the evidence. See Marshall, 210 S.W.3d at 625.
We hold that the evidence of the element of intent is factually sufficient to support
appellant’s conviction for the offense of capital murder.
          Accordingly, we overrule appellant’s sole issue.



 
 
                                                         Conclusion
          We affirm the judgment of the trial court.
 




                                                             Laura Carter Higley
                                                             Justice




Panel consists of Chief Justice Radack and Justices Nuchia and Higley. 

Do not publish. See Tex. R. App. P. 47.2(b).